# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 25, 2001 Session

## STATE OF TENNESSEE v. SHAUN MICHAEL FLEEGLE

**Direct Appeal from the Criminal Court for Knox County**
**No. 66765     Richard R. Baumgartner, Judge**

-------------------

**No. E2000-02045-CCA-R3-CD**
**January 22, 2002**

-------------------

A Knox County jury found the Defendant guilty of voluntary manslaughter, a Class C felony; and the trial court sentenced him as a Range I, standard offender to five years, four of which were to be served on probation. The Defendant now appeals, arguing the following: (1) that the trial court failed to properly consider enhancement and mitigating factors during sentencing, and (2) that the trial court erred in failing to grant judicial diversion. Finding that the trial court properly sentenced the Defendant, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

M. Jeffrey Whitt (on appeal and at trial) and Rick Clark (at trial), Knoxville, Tennessee, for the Appellant, Shaun Michael Fleegle.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## I. FACTS

On October 2, 1998, the Defendant, Shaun Michael Fleegle, along with his older brother, Daniel Fleegle, and their parents, traveled to Knoxville, Tennessee, from their home in Florida. The Defendant's parents continued on to West Virginia, while the Defendant and his brother stayed in Knoxville. The Defendant's family had previously lived in Tennessee, and the two boys planned to stay with their former neighbor, Tommy Willis, and his family during their visit.

On the night that the Defendant and his brother arrived, Tommy Willis invited some people over to his house because his parents were going out for the evening. At some point that night, Joey

Patty (the victim), along with his girlfriend, Ghippi Lee, and two other friends, Todd Tucker and Susie Grove, arrived at the Willis home. Shortly after Patty and his friends arrived, there was a brief altercation between Patty and Daniel Fleegle. Susie Grove testified that the fight took place because Fleegle made a "dirty remark" to Lee. Following the dispute, Willis asked Patty and his friends to leave. Patty, who was driving Lee's car, began to leave, along with Lee, Tucker and Grove. However, the car never left the driveway.

Patty's girlfriend, Ghippi Lee, testified that as they were driving down the driveway, they "heard beating on the car. It sounded like the whole car was caving in." Lee stated that she also heard "cussing" outside the car. Lee testified that Patty got out of the car first and was met by Daniel Fleegle. Lee recalled that she got out next, and then the two people in the back seat, Tucker and Grove, followed. Lee testified that when Patty got out of the car, he and Daniel Fleegle began fighting. Lee stated that Patty was on top of Fleegle "holding him down" and that at some point while Patty was holding Fleegle down, she "smacked" Fleegle because Patty told her "to smack him for disrespecting [her]." Lee testified that after she hit Fleegle, she noticed that Patty's hands "just let go, kind of crippled up." Lee testified that Patty "fell back," and she turned to see "a guy in a striped shirt running up the hill, and he just threw something to the side." Lee testified that she later found out that the person running up the hill was the Defendant. According to Lee, Patty tried to get up, and then his eyes "rolled back in his head." Lee stated that she, Tucker and Grove started to take Patty to the hospital, but decided to stop at a nearby market to call 911 because Patty was "getting worse."

Todd Tucker, who was also in the car with Patty, testified that as they were driving down the driveway, "[a] couple of people came down from the hill and started beating on the car and everything, hitting their hands on the car, and at that point, [Patty] got out." Tucker testified that "as soon as [Patty] got out, he locked up with Daniel [Fleegle]." According to Tucker, the two "just kind of like grabbed each other and ended up on the ground." Tucker testified that the Defendant then "came barreling down the hill" and "struck [Patty] in the head with the baseball bat." Tucker testified that the Defendant hit Patty on the back of his head three times. Tucker stated that he jumped in front of the Defendant, "got him on the ground," and the Defendant then got up and ran up the driveway.

Susie Grove, Tucker's girlfriend, testified that as Patty was driving down the driveway, somebody began to "beat[] on" the car. Grove testified that Patty got out of the car, and he and Daniel Fleegle "started wrestling around." Grove stated that Patty was holding Fleegle down while telling Lee to "pop his mouth for what he said" and that Lee hit Fleegle with her hand. Grove testified that she saw the Defendant run down the hill, but she must have blacked out during the incident, because the next thing she remembered was the Defendant running back up the hill after the fight was over.

Chris Spencer was at the Willis home on October 2, 1998, and he testified that as Patty and his friends were leaving, Fleegle "ran and started hitting on the back of their car and tr[ied] to get up beside the driver's side door, you know, yelling this or that." Spencer stated that Patty then "got out of the car and grabbed Daniel Fleegle around the waist and hoisted him up in the air and

slammed him down on his back on the bank beside the driveway." Spencer recalled that he then saw a man that he later determined to be the Defendant "swing something in the direction of [Patty] and Mr. Fleegle."

Thomas Willis testified that after the original altercation between Patty and Fleegle, he was walking towards the house when "everybody started yelling." Willis stated that he saw a group, including Daniel Fleegle, gathered at the end of the driveway near the car that Patty was driving. Willis testified that when he got to the car, Fleegle and Patty "were wrestling around on the ground." According to Willis, Fleegle and Patty "were throwing rabbit punches." Willis believed that at one point, Fleegle was on top of Patty. Willis testified that while Fleegle and Patty were wrestling, the Defendant ran to them and hit Patty two times on the head with a bat. Willis stated that after the Defendant hit Patty, he and his brother, Daniel, "took off running."

Daniel Fleegle testified that he and Patty got into "a little scuffle," after which Patty and his friends were asked to leave. Fleegle testified that as Patty and his friends were leaving, Patty "jump[ed] out of the car at the end of the driveway" and Fleegle "walked down there to meet him." Fleegle testified that when he reached Patty, they "started arguing more and [Patty] picked [Fleegle] up and slammed [him] on the concrete." Fleegle stated that he was "out" and did not remember anything until Josh McKelvey picked him up and helped him up the hill.

The Defendant testified that on October 2, 1998, his eighteenth birthday, he and his brother arrived from Florida at the Willis home in Knoxville. The Defendant stated that he did not witness the fight between his brother and Patty that took place in the garage; however, he did hear Willis tell Patty and his friends to leave. The Defendant stated that as Patty and his friends were leaving, he turned to go inside the house, but stopped when "everybody started yelling again." According to the Defendant, he went to see what was happening and saw Patty "pick [his] brother up and slam him on the ground," and he noticed that his brother was not moving. The Defendant testified that he "went to Aaron's truck and got the bat and ran down there and hit [Patty]." The Defendant stated that he did not remember how many times or how hard he hit the victim. According to the Defendant, he then ran up the hill because he wanted to call an ambulance. The Defendant recalled that he ran into Thomas Willis' mother's bedroom and called 911. After calling 911, he jumped out of the window and ran next door to Glenda Johnson's house. When asked at trial what happened the night he arrived in Knoxville, the Defendant testified, "I killed that boy." However, he testified that he hit Patty only because he was trying to "[s]top him from killing [his] brother."

Glenda Johnson, one of the Willis' neighbors, testified that on October 2, 1998, she was working at her computer when she heard a noise outside. Thinking that it was her son, she opened the door, and the Defendant "came flying past [her]." According to Johnson, the Defendant "was real scared." Johnson stated that the Defendant told her, "Shut the door; there's a fight." Johnson testified that when she grabbed the phone to call 911, the Defendant told her that he had already called. Johnson testified that the Defendant told her that "somebody ha[d] been hit with a bat." Johnson called 911, and the dispatcher asked her how many people were involved in the fight. Johnson recalled that the Defendant told her that "maybe fifteen" were involved. Johnson testified that the Defendant was "terrified" and that she had "never seen a child so scared." According to

Johnson, the Defendant told her that he had "to go back" because he had "to see about [his] brother."

Sandra Elkins, Director of Autopsy Services and Forensic Pathology at the University of Tennessee Medical Center and Knox County Medical Examiner, testified that she performed the autopsy on Joseph Patty. Elkins testified that Patty received a minimum of three blows to the head which ultimately caused his death. Elkins testified that the injuries causing Patty's death were consistent with blows from a baseball bat.

The Knox County Grand Jury indicted the Defendant for second degree murder for the death of Joseph Patty, and a Knox County jury convicted the Defendant of the lesser-included crime of voluntary manslaughter. The trial court sentenced the Defendant to five years, four of which were to be served on probation.

## II. ANALYSIS

The Defendant contends that he was improperly sentenced. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

The trial court stated in the sentencing order that it "considered the evidence received at trial and the sentencing hearing; the pre-sentence report, including the victim-impact statement; the principles and guidelines of the sentencing act; the arguments of counsel as to enhancing and mitigating factors as well as sentencing alternatives; the nature and characteristics of criminal conduct involved; the testimony of the defendant; and the potential for rehabilitation or treatment." Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

## A. LENGTH OF SENTENCE

The Defendant first argues that the sentence imposed by the trial court was excessive. Specifically, the Defendant argues that the trial court failed to properly consider and weigh the enhancement and mitigating factors in this case.

The trial court applied the following enhancement factors in sentencing the Defendant: (1) that the Defendant has a previous history of criminal convictions and criminal behavior in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(1); (2) that the Defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense, id. § 40-35-114(9); and (3) that the Defendant had no hesitation about committing a crime when the risk to human life was high, id. § 40-35-114(10). The Defendant concedes that factor (1) was properly applied because he admitted in the pre-sentence report that he had used marijuana in the past. The trial court noted, and we agree, that this factor should be given little weight.

The Defendant also concedes that the trial court properly applied factor (9) because the Defendant used a baseball bat during the commission of the offense. However, the Defendant argues that this factor should be given less weight because the Defendant took possession of the baseball bat only after he saw his brother "being slammed to the ground and being struck by the deceased."

We conclude that there is no reason why this factor should be given less weight simply because the Defendant was not armed with the bat for a substantial period of time. The evidence presented at trial established that the Defendant hit the victim three times on the head with the bat and thus "possessed or employed a . . . deadly weapon during the commission of the offense." Id. § 40-35-114(9). The Defendant also argues that "less weight should be given to cases where a death results from the use of the weapon because it is closely akin to being an element of the offense." The trial court may not apply an enhancement factor that is an essential element of the offense. State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). The Defendant in this case was found guilty of voluntary manslaughter, which does not require the use of a weapon. See Tenn. Code Ann. § 39-13-211(a). The trial court properly applied and weighed this factor.

The Defendant next argues that the trial court erred in applying factor (10) because "the State failed to meet its burden of proving that a *high* risk of death existed as to Ms. Ghippi Lee and/or Daniel Fleegle." (Emphasis in original.) The trial court noted in its decision that "it is immaterial whether Ms. Lee was aware of the act as she certainly was in the zone of danger when the attack occurred and therefore was at risk even though she was unaware of that risk." The evidence at trial established that when the Defendant began striking the victim, Ghippi Lee was right beside the victim and Daniel Fleegle was underneath him. Lee testified that Patty's blood "splattered" on her. Thus, Lee and Fleegle were certainly in the zone of danger. This issue is without merit.

The trial court applied the following mitigating factors in sentencing the Defendant: (1) that the Defendant assisted the authorities in locating or recovering any property or person involved in the crime, Tenn. Code Ann. § 40-35-113(10); (2) that the Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct, id. § 40-35-113(11); and (3) any other factor consistent with the purposes of this chapter, id. § 40-35-113(13). The Defendant argues that the trial court failed to adequately articulate how the mitigating factors were weighed and asserts that these factors "should be given great weight." We disagree. In applying factor (10), the trial court noted that "the discovery of the bat's location was highly likely without the defendant's assistance." Thus, we may assume that the trial court did not place much weight on this factor. In applying factor (11), the court stated that it was "mindful of the fact that the jury has already mitigated [the Defendant's] culpability by finding him guilty of the lesser included offense of voluntary manslaughter." The trial court further found that "while this factor does apply[,] the weight to be given is not as great as it would have been had he been found guilty of the greater offense of murder." Finally, the trial court applied factor (13), which includes any other factor consistent with the purpose of the chapter. In doing so, the trial court found that the Defendant was "extremely remorseful" about his conduct.

The trial court found that enhancing factors (6) and (10) outweighed the applicable mitigating factors. The sentence range for a Range I, standard offender convicted of a Class C felony is three to six years. See id. § 40-35-112(a)(3). The trial court sentenced the Defendant to five years, four of which are to be served on probation. In our view, the sentence imposed by the trial court is clearly not excessive. This issue is without merit.

## B. JUDICIAL DIVERSION

The Defendant also argues that the trial court erred in declining to impose a sentence pursuant to Tennessee Code Annotated § 40-35-313, commonly referred to as judicial diversion. According to this statute, the trial court may in its discretion, following a determination of guilt, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Id. § 40-35-313(a)(1)(A). A qualified defendant is one who pleads guilty or is found guilty of a misdemeanor or a Class C, D or E felony; who has not previously been convicted of a felony or a Class A misdemeanor; and who is not seeking deferral for a sexual offense or a Class A or Class B felony. Id. § 40-35-313(a)(1)(B)(i)(a)-(c); State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

When a defendant contends that the trial court committed error in refusing to grant judicial diversion, this Court must determine whether the trial court abused its discretion in failing to sentence pursuant to the statute. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). Judicial diversion is similar to pretrial diversion; however, judicial diversion follows a determination of guilt, and the decision to grant judicial diversion is initiated by the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). When a defendant challenges the trial court's denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958. As this Court said in Anderson,

> [w]e conclude that judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under T.C.A. § 40-15-105. Therefore, upon review, if "any substantial evidence to support the refusal" exists in the record, we will give the trial court the benefit of its discretion. Only an abuse of that discretion will allow us to overturn the trial court.

857 S.W.2d at 572 (citation omitted).

The criteria that the trial court must consider in determining whether a qualified defendant should be granted judicial diversion include the following: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. Cutshaw, 967 S.W.2d at 343-344; Parker, 932 S.W.2d at 958. An additional consideration is whether judicial diversion will serve the ends of justice, i.e., the interests of the public as well as of the defendant. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958.

A trial court should consider the same factors in judicial diversion that it does in pretrial diversion. Cutshaw, 967 S.W.2d at 344. In addition, this Court should apply "the same level of review as that which is applicable to a review of the district attorney general's action in denying pretrial diversion." State v. George, 830 S.W.2d 79, 80 (Tenn. Crim. App. 1992). We conclude that the record does not show an absence of any substantial evidence to support the trial court's refusal to grant judicial diversion.

Although the trial court did not specifically address the issue in its sentencing order, we conclude that the record contains substantial evidence to support the denial of judicial diversion. The Defendant was charged with second degree murder and convicted of the lesser-included offense of voluntary manslaughter. The Defendant hit the unarmed victim three times on the head with a baseball bat, killing the victim and causing a high risk to other lives. We conclude that the circumstances of this offense warrant the trial court's denial of judicial diversion. Morever, the trial court considered the deterrent effect of incarceration and concluded that "a sentencing involving no incarceration would depreciate the seriousness of this tragic offense and fail to deter others . . . ." We agree. This issue is without merit.

_____
ROBERT W. WEDEMEYER, JUDGE